Connie Jo ST. CLAIR, Appellee,

v.

Richard FAULKNER, Appellant.

No. 65546.

Supreme Court of Iowa.

May 13, 1981.

Steven E. Ort, Keokuk, for appellant.

Barry M. Anderson of Anderson & McMurray, Keokuk, for appellee.

Considered by REYNOLDSON, C. J., and UHLENHOPP, HARRIS, ALLBEE, and LARSON, JJ.

UHLENHOPP, Justice.

The question before us is whether in the present circumstances Iowa courts have jurisdiction to adjudicate the right of custody of a child as between her parents under the Uniform Child Custody Jurisdiction Act. The merits of the custody dispute between the parents are not presented. The uniform act is found in chapter 598A of the Iowa Code. Indiana, the other state involved, has the act in sections 31–1–11.6–1 to .6–24 of its Code. This court dealt with various aspects of the act in *Slidell v. Valentine*, 298 N.W.2d 599 (Iowa 1980); *In re Marriage of Mintle*, 294 N.W.2d 564 (Iowa 1980); *In re Mann*, 293 N.W.2d 185 (Iowa 1980); *Pierce v. Pierce*, 287 N.W.2d 879 (Iowa 1980); and *Barcus v. Barcus*, 278 N.W.2d 646 (Iowa 1979). *See also In re Marriage of Schissel*, 292 N.W.2d 421, 424 (Iowa 1980); *In re Marriage of Vogel*, 271 N.W.2d 709, 711 (Iowa 1978); 28 U.S.C. § 1738A (Supp. IV. 1980) (Parental Kidnapping Prevention Act of 1980).

Petitioner Connie Jo (now) St. Clair and respondent Richard Faulkner were married in 1969. On April 22, 1971, a child was born to them, Christina. At first the parties lived in Iowa, but they later moved to Ohio. In 1973 Richard obtained a divorce from Connie in Ohio, and the court awarded him custody of Christina. Connie Jo moved to Iowa.

In 1974 Connie Jo went to Ohio and removed Christina to Iowa. Various court charges grew out of this incident and, after a home study was made of Richard's home, an Iowa juvenile court returned Christina to Richard.

Richard subsequently married his present wife, Mary, and Connie Jo married her present husband, Thomas. Richard and Mary moved to Indiana, and from 1974 to 1979 Christina lived with them there. Connie Jo has visited the child at times, but not extensively. Richard and Christina have a close relationship as father and daughter.

In June 1979, Richard and Mary experienced marital problems. Mary commenced a divorce suit in Indiana and obtained an injunction removing Richard from the home. Richard and Mary have a child of their own, and that child remained with Mary. But Richard had the problem of what to do about Christina while his marital problem was being resolved.

Richard had Mary pack Christina's clothes and personal effects, and he brought the child and her clothing, effects, and bicycle to Connie Jo in Iowa.

Richard next obtained an apartment in Indiana and notified Connie Jo he was coming to Iowa for the child. Thereupon Connie Jo, about three weeks after Richard had brought Christina to Iowa, commenced this suit to modify the Ohio decree and change custody of Christina to her, and Connie Jo also obtained an ex parte order giving her temporary custody. In her petition, Connie Jo alleged that for this state to assume jurisdiction would be in the child's best interests, that the child is present here, that Ohio no longer has any contact with the child, and that Richard has stated he does not care for the child but will not agree to

change custody, and she also made allegations relative to the merits of the custody question.

Richard filed a special appearance challenging the jurisdiction of Iowa courts under the act, and the court held a hearing. The parties did not agree at the hearing as to what was said when Richard brought Christina to Connie Jo or as to their respective intentions at that time. Connie Jo and Thomas testified that Richard gave them the impression he was through with Christina and could no longer cope with custody of her. Richard testified that he did not intend to abandon Christina or leave her permanently, but only until he could work out his divorce problem.

The following is illustrative of Connie Jo's testimony:

Q. When he brought her to Keokuk, what was brought with Christina as far as her belongings? A. To my knowledge everything she owned.

Q. What were some of the things that were brought with her? A. She brought all of her winter clothing, all the clothes that she had, her coat, her school papers, her report cards, everything that she owns, to my knowledge. All of the jewelry boxes, most of her jewelry, and like she told me, there was a few items that was left.

Q. Did you have a conversation with Mr. Faulkner when he brought Christina to your house? A. Yes.

Q. What did he say? A. He told me that he was bringing her down here because he knew she was better off here under the circumstances that was going on out there in the State of Indiana.

Q. Did he indicate anything further as to what he intended to do with his— A. He told me that he was divorcing her, told my husband and I both, and he told me that he would never marry again, but he would live with other women. That's when I indicated to him that, right, there was one point that Christina would be better off with me, that she wasn't to live that kind of life.

Q. What did he say in response to that? A. He says, "I know. That's why I brought her here and that's why she's here now. I knew she would be better off."

Q. Did you ask him if he would voluntarily change the custody to you? A. He was planning on it, the way he talked to us. He told me and my husband to talk it over through the summer months and most likely we would end up with her.

Q. Okay. Did you at some point in time get concerned about your daughter as far as what was in her best interests at this point? A. Yes.

Q. Is that the reason this Petition was ultimately filed? A. Yes.

Also:

Q. What were the circumstances leading up to Christina being brought down to you? A. Well, I had a call the week before he brought her to me and she was crying, saying that her dad was—

Mr. Ort: Objection, Your Honor. The witness is testifying as to hearsay.

The Court: Ruling reserved.

Q. (By Mr. Anderson.) Go ahead. A. And she was awful upset and I asked to talk to her father or stepmother. Well, neither one would get on the phone, so I asked her to ask her father if I just couldn't come and get her. She said that he was going to bring her down to live with me, and in the background he says, "Just tell your mom that I don't love you anymore."

In addition:

Q. Isn't it in fact true when Mr. Faulkner brought Christina out this summer that he told you that he had not decided? A. No. When he first brought her, yes, he didn't know for sure, but as it went on he had voluntarily—after I had served these papers on him, he asked me to contact my lawyer to bring up the necessary papers and he would sign her over to me, and this is the day that he had got the papers served on me.

Thomas testified:

Q. You a party to any conversations or a witness to any conversations that Mr. Faulkner had in your house? A. Yes.

Q. What did— A. I was out back and they said that I ought to come around, he was going to talk to us about it. He said everything that was talked about a while ago, and he said he would try and send a few dollars once in a while because she ate a whole lot. I said "That's no problem."

Q. He indicate that he thought it was in Christina's best interests at this time to live with her mother? A. Yes. He had problems out there.

Q. Also indicate he intended not to get married, but to live with women? . . . A. Yes, he did. He said he would never get married again, this was it.

In his testimony, Richard denied the St. Clairs' claims:

Q. To the best of your knowledge, how long has Christina been in Iowa? A. She come down this summer.

Q. And what was the purpose of her coming down this summer? A. To visit her mom.

Q. Have you ever expressed a desire to abandon Christina? A. No, I have not.

Also:

Q. Is it a fact, Mr. Faulkner, that you brought Christina down here and told Mrs. St. Clair that you wanted her to take the child, that you no longer could take care of her? A. No.

Q. You did not say anything that would lead her to believe that? A. No.

Q. Did you say anything to her that would lead her to believe that you were not capable any longer of taking care of Christina? A. No.

Q. Did you say anything to your wife about the fact that you were having marital difficulties and intended to live with a lot of women and that you therefore couldn't take care of your daughter? A. No.

Q. Did you ever indicate to her that you thought it would be in Christina's best interests to live with her mother at this point in time? A. That was rephrased the way it is. No.

In addition:

Q. Mr. Faulkner, did you ever tell Connie Jo St. Clair or her husband that you did not love Christina and that you did not want her any longer? A. No, I did not.

. . . .

Q. Did you ever tell Mr. and Mrs. St. Clair you had planned for your lifestyle living with different women? A. No.

Richard also testified about Christina's connections with Indiana such as her friends, school, and physician.

The court overruled the special appearance, saying:

Of particular significance regarding a special appearance are the pleadings in this case. Petitioner makes allegations which fall within the wording of Section 598A.3. The hearing on the special appearance produced at least a scintilla of evidence to lead this Court to conclude that it has jurisdiction of the subject matter and of the person of the parties, and that the special appearance should be overruled. However, this is not to say that the Court finds it will exercise its jurisdiction, for Section 598A.7 provides that a court may decline to exercise jurisdiction at any time before making a decree, and this determination cannot be made until further evidentiary hearing on the allegations of the petition takes place.

It is, therefore, the conclusion of the Court that the allegations of the pleadings and the evidence produced at the hearing bars this court to find as a matter of law that it does not have jurisdiction. The question of whether the Court will exercise its jurisdiction remains unresolved until a hearing on the merits.

Connie Jo retained possession of the child. Richard and his wife obtained marriage counseling and reconciled.

The parties subsequently tried the case on the merits of the custody question, completing the trial on July 15, 1980. On July 18, 1980, the trial court held for Connie Jo and awarded her custody, and thereafter Richard appealed. This court must resolve the jurisdictional issue.

I. *Scope of review.* The usual scope of review in special appearance proceedings is stated thus in *Larsen v. Scholl,* 296 N.W.2d 785, 787 (Iowa 1980):

> Our scope of review in an appeal from ruling on a special appearance has been discussed in several recent decisions. We accept the allegations of the petition as true. Plaintiff has the burden to sustain the requisite jurisdiction, but when a prima facie case is established, defendant has the burden to produce evidence to rebut or overcome it. The trial court findings in this special proceeding have the force and effect of a jury verdict. However, we are not bound by trial court's conclusions of law or by its application of legal principles. *Berkley International Co. v. Devine,* 289 N.W.2d 600, 602 (Iowa 1980); *Kagin's Numismatic Auctions, Inc. v. Criswell,* 284 N.W.2d 224, 225 (Iowa 1979); *DeCook v. Environmental Security Corp.,* 258 N.W.2d 721, 726 (Iowa 1977). In this case the assumed facts are not in dispute. Our determination turns on the application of legal principles.

The situation is somewhat different, however, in cases under the Uniform Child Custody Jurisdiction Act. Those cases, involving custody, are equitable in nature. *Doan Thi Hoang Anh v. Nelson,* 245 N.W.2d 511, 513 (Iowa 1976); *In re Marriage of Settle,* 276 Or. 759, 772, 556 P.2d 962, 969 (1976). They involve two basic issues: which state is in the better position to resolve custody quickly, permanently, and on the merits and, if the forum state is in the better position, who should be granted custody, under the evidence.

We call the first of these issues a question of jurisdiction of the subject matter, and our decided cases reveal that when that issue reaches this court—and the issue can be raised at any time—we actually decide all questions concerning it anew. *E. g., Slidell,* 298 N.W.2d at 601–02; *Pierce,* 287 N.W.2d at 881; *Barcus,* 278 N.W.2d at 650. We stated in *Pierce,* at 881–82:

> While Pauline argues lack of subject matter jurisdiction in the Iowa district court on a specific statutory ground, we are not limited in our review to consideration of that specific argument. "Jurisdiction of the subject matter is the power to hear and determine cases of the general class to which the proceedings belong." *Green v. Sherman,* 173 N.W.2d 843, 846 (Iowa 1970). "When a court acts without legal authority to do so, it lacks jurisdiction of the subject matter." *In re Adoption of Gardiner,* 287 N.W.2d 555, 559 (Iowa 1980). "The court's jurisdiction of the subject matter however may be raised at any time and is not waived even by consent." *Green,* 173 N.W.2d at 846. We will determine subject matter jurisdictional issues even though not raised in the appellate briefs of either party. *Swets Motor Sales, Inc. v. Pruisner,* 236 N.W.2d 299, 302 (Iowa 1975). Also, we will examine the grounds for jurisdiction on our own motion before proceeding further. *Qualley v. Chrysler Credit Corp.,* 261 N.W.2d 466, 468 (Iowa 1978). If we determine subject matter jurisdiction is absent, an order dismissing the petition is the only appropriate disposition. *Lloyd v. State,* 251 N.W.2d 551, 558 (Iowa 1977). We therefore must determine whether the district court of Iowa lacked subject matter jurisdiction on any grounds.

The trial court apparently regarded this special appearance as in equity; it did not rule on objections to evidence.

■ We hold that this court gives de novo review to questions of subject-matter jurisdiction under the act, whether raised by special appearance or by some other procedural device in the course of litigation under the act. *See People ex rel. Bruzzese v. Bruzzese,* 70 A.D.2d 957, 958, 417 N.Y. S.2d 763, 764–65 (1979) (determination of jurisdiction under the act requires preliminary findings). In other respects the special appearance procedural rules, quoted from *Larsen,* apply.

■ II. *Jurisdiction of subject matter.* We pass to the issue of jurisdiction. Ohio granted Richard custody in 1973. Connie Jo is asking the Iowa courts to change custody. In such cases, under *Pierce,* 287

N.W.2d at 882, the starting point is section 598A.14 of the Code:

If a court of another state has made a custody decree, a court of this state shall not modify that decree unless it appears to the court of this state that the court which rendered the decree does not now have jurisdiction under jurisdictional prerequisites substantially in accordance with this chapter, or has declined to assume jurisdiction to modify the decree, and the court of this state has jurisdiction.

A. Two requirements exist under section 598A.14: that Ohio does not have, or has declined, jurisdiction, and that Iowa does have jurisdiction. The first requisite is met: none of the parties has lived in Ohio for several years; that state has lost jurisdiction. *Slidell,* 298 N.W.2d at 604; *Roberts v. District Court,* 596 P.2d 65, 67 (Colo. 1979). The question therefore is whether Iowa has jurisdiction.

B. In considering whether Iowa has jurisdiction, we accept Connie Jo's allegations as true and place the burden of persuasion on her. But if and when she establishes a prima facie case of jurisdiction, Richard has the burden of going forward with evidence to rebut or overcome it. *Larsen,* 296 N.W.2d at 787.

Jurisdiction in Iowa is determined under section 598A.3:

1. A court of this state which is competent to decide child custody matters has jurisdiction to make a child-custody determination by initial or modification decree if:

a. This state is the home state of the child at the time of commencement of the proceeding, or had been the child's home state within six months before commencement of the proceeding and the child is absent from this state because of removal or retention by a person claiming custody or for other reasons, and a parent or person acting as parent continues to live in this state; or

b. It is in the best interest of the child that a court of this state assume jurisdiction because the child and the child's parents, or the child and at least one contestant, have a significant connection with this state, and there is available in this state substantial evidence concerning the child's present or future care, protection, training, and personal relationships; or

c. The child is physically present in this state, and the child has been abandoned or it is necessary in an emergency to protect the child because the child has been subjected to or threatened with mistreatment or abuse or is otherwise neglected or dependent; or

d. It appears that no other state would have jurisdiction under prerequisites substantially in accordance with paragraph "a", "b", or "c", or another state has declined to exercise jurisdiction on the ground that this state is the more appropriate forum to determine the custody of the child, and it is in the best interest of the child that this court assume jurisdiction.

2. Except under paragraphs "c" and "d" of subsection 1, physical presence in this state of the child, or of the child and one of the contestants, is not alone sufficient to confer jurisdiction on a court of this state to make a child-custody determination.

3. Physical presence of the child, while desirable, is not a prerequisite for jurisdiction to determine custody.

Under the allegations and the evidence, Iowa did not have jurisdiction under paragraph 1(a) of section 598A.3 when Connie Jo commenced the action. Iowa was not Christina's home state at the commencement of this action or within six months before. A "home state" is defined thus in section 598A.2(5):

"*Home state*" means the state in which the child, immediately preceding the time involved, lived with the child's parents, a parent, or a person acting as parent, for at least six consecutive months, and in the case of a child less than six months old the state in which the child lived from birth with any of the persons mentioned. Periods of temporary absence of any of the named persons are counted as part of the six-month or other period.

Under paragraph 1(*b*) of section 598A.3, Iowa had jurisdiction when the suit was started if (a) it was in Christina's best interest for this state to assume jurisdiction because Christina and at least one contestant have significant connections with this state and (b) substantial evidence exists here of such factors as the child's care and protection. We cannot say it is in Christina's "best interest" to have Iowa determine custody; she and her father and stepmother lived together for several years in Indiana. That state would appear to be in a better position to resolve the issue, and Richard contended throughout that the material witnesses are there. *Schlumpf v. Superior Court*, 79 Cal.App.3d 892, 900–01, 145 Cal. Rptr. 190, 195–96 (1978). Moreover, while Connie Jo has a "significant connection" ·with Iowa, Christina did not have such a connection at the commencement of this action; she had been here only about three weeks. *Matteson v. Matteson*, 379 So.2d 677, 680 (Fla. DCA 1980). Although evidence regarding such factors as care and protection exist here, no more such factors exist here than would be present in the usual case of an interstate custody controversy since one parent usually lives in the forum state. Considerably more evidence regarding Christina, her home, her associates, and her past must exist in Indiana than here. Iowa does not have jurisdiction under paragraph 1(*b*).

Regarding paragraph 1(*c*), we observe the following in Uniform Child Custody Jurisdiction Act § 3 (Commissioners' Note):

Paragraph 3 of subsection (a) [corresponding to our section 598A.3(1)(*c*)] retains and reaffirms *parents patriae* jurisdiction, usually exercised by a juvenile court, which a state must assume when a child is in a situation requiring immediate protection. This jurisdiction exists when a child has been abandoned and in emergency cases of child neglect. Presence of the child in the state is the only prerequisite. This extraordinary jurisdiction is reserved for extraordinary circumstances. See Application of Lang, 9 App.Div.2d 401, 193 N.Y.S.2d 763 (1959). When there is child neglect without emergency or abandonment, jurisdiction cannot be based on this paragraph.

Paragraph 1(*c*) requires (a) that Christina be physically present here and (b) that she has been abandoned or emergency protection is necessary because of subjection to or threat of mistreatment or abuse, or neglect or dependency exists. Christina was physically present in Iowa on commencement of the action, but we cannot say Richard "abandoned" her. While abandonment does not require any particular length of time, it connotes a "relinquishment or surrender of rights or property by one person to another; a giving up; a total desertion." *Pitzenberger v. Schnack*, 215 Iowa 466, 469–70, 245 N.W. 713, 714–15 (1932). The court stated on the same pages, "In a technical sense, the word means the relinquishment of a right; the giving up of something to which one is entitled; the giving up of a thing absolutely without reference to any particular person or purpose." "Abandon" is defined as follows in *Black's Law Dictionary* 9 (rev. 4th ed. 1968) (citations omitted): "To desert, surrender, forsake or cede. To relinquish or give up with intent of never again resuming one's right or interest. To give up absolutely; to forsake entirely; to renounce utterly; to relinquish all connection with or concern in; to desert. It includes the intention, and also the external act by which it is carried into effect."

On this record, we are persuaded that Richard temporarily placed Christina with Connie Jo while he attempted to work out his marital problem. Abandonment does not appear. *In re Sagan*, 261 Pa.Super. 384, 390, 396 A.2d 450, 453 (1978); *Hricko v. Stewart*, 99 Misc.2d 266, 269, 415 N.Y.S.2d 747, 749 (Fam.Ct.1979).

Paragraph 1(*c*) also covers emergency situations where mistreatment, abuse, neglect, or dependency exists. These factors do not appear here. *See Roberts*, 596 P.2d at 68; *Ruff v. Ruff*, 98 Misc.2d 934, 935, 415 N.Y.S.2d 179, 180 (Fam.Ct.1979). Iowa does not have jurisdiction under paragraph 1(*c*).

Finally, paragraph 1(*d*) does not apply because Indiana has not declined jurisdic-

tion. *Cf. Mann*, 293 N.W.2d at 186 (declination by Oregon). None of the provisions giving Iowa jurisdiction is satisfied.

The natural desire of a court faced with a custody dispute is to resolve the dispute. *Slidell*, 298 N.W.2d at 601 ("the strong motivation of courts to reassess the child's circumstances and act 'in his best interest' "). In many interstate custody cases, however, this bandies the child back and forth and leaves the child's permanent settlement in a state of suspension. Thus we should not be reluctant to give effect to the Uniform Child Custody Jurisdiction Act. At the time this suit began, Christina had lived most of her life in Ohio and Indiana, and Indiana has been her home most recently for several years and the home of her custodian-father, her stepmother, and her half brother. She was here only about three weeks before commencement of the suit and, we believe, not under "abandonment" by Richard but rather, pending resolution of his marital problem. Giving full effect to the language and intent of the act, we hold that Iowa did not have jurisdiction.

The district court should have sustained the special appearance and dismissed the Iowa action, and we return the case to district court for that purpose. With dismissal of the action, the temporary custody order also falls. If Connie Jo desires to commence an action in Indiana, that is of course her prerogative. Unless within sixty days she commences such an action and obtains an Indiana order for temporary custody under its law, she is required to surrender Christina to Richard. *Cf. Barcus*, 278 N.W.2d at 652 (temporary stay).

We do not reach Richard's arguments of forum non conveniens, under section 598A.7, and unclean hands, under section 598A.8.

REVERSED.