In the Matter of the Dissolution of the Marriage of
SETTLE nka FULLER, *Petitioner,*
*and*
SETTLE, *Respondent.*
(No. 418438, CA 5513, SC 24629)

In the Matter of the Application of James W. Settle for
a Writ of Habeas Corpus,
SETTLE, *Respondent,*
*v.*
SETTLE nka FULLER, *Petitioner.*
(No. 419978, CA 5513, SC 24629)
556 P2d 962

*R. M. Atkinson,* Legal Aid Service, Portland, argued the cause and filed briefs for petitioner.

*Ira L. Gottlieb,* Portland, argued the cause and filed a brief for respondent.

HOLMAN, J.

## HOLMAN, J.

These cases involve a dispute between a mother and a father over the custody of their two minor children. The trial court granted custody to the mother and upon appeal the Court of Appeals reversed the trial court and gave custody to the father. 25 Or App 579, 550 P2d 445 (1976). We granted review to determine whether the Uniform Child Custody Jurisdiction Act adopted by the 1973 Legislative Session[1] necessitates a result which would appear to be inconsistent with our last opinion on the subject, *Hawkins v. Hawkins,* 264 Or 221, 504 P2d 709 (1972).

Father and mother were married in Elkhart, Indiana, in 1968. Their two children are Tracy, an 8-year-old girl, and James, Jr., a 4-year-old boy. Tracy was born to mother in a previous marriage and adopted by father. In August 1973 mother left Elkhart with the children and a man by the name of Ross Fuller and eventually came to Oregon. During their absence father began a relationship with Beverly Walston, who was then the wife of David Walston and the mother of three children, one of whom was conceived by Walston and the other two by Fuller at a time when she was cohabiting with him.

In November 1973 mother returned to Elkhart from Oregon with the children and Fuller. In December she filed a suit for divorce and was given temporary custody of the children by the court pursuant to an agreement by the parties. On March 5, 1974, father filed an answer requesting that he be given the divorce and custody of the children. In the latter part of March mother again left Elkhart with the children and returned to Oregon. She made no attempt to let either the court or father know where she had gone. She claims she had no knowledge at the time she left Elkhart of father's request for custody of the children and that such request was not the reason for her leaving. She was not able to convince the trial court

[1] Oregon Laws 1973, ch 375.

or the Court of Appeals that she had no such knowledge and she has been no more able to convince this court. Fuller joined her in Oregon sometime during the following month.

The final hearing in the Indiana divorce proceeding took place in May 1974, mother's lawyer having withdrawn from the case due to his client's absence. The court heard testimony of father and others to the effect that mother had had intercourse with Fuller in the presence of the children while staying with friends. The court found that mother was an unfit person to have custody and granted custody to father, who, unbeknown to the court, was then living with Beverly Walston and was the father of her unborn child.

Mother learned of the divorce in June 1974 and promptly married Fuller while residing in Oregon. Thereafter father attempted to locate the children and eventually found them in Oregon. He thereupon came to Oregon and instituted a habeas corpus proceeding based upon his award of custody by the Indiana decree. Shortly prior to the institution of that proceeding mother had registered the Indiana decree in Oregon and had filed a petition for a change of custody of the children from father to herself. The two proceedings were consolidated for trial, thus setting the stage for the present litigation.

Two or three weeks prior to the hearing in the trial court father married Beverly Walston, who, by that time, had secured a divorce from Donald Walston and had given birth to father's child. The hearing in the trial court was held on September 3, 1975—20 months from the time the children had last seen father—and both parents and their spouses appeared and testified.

In addition to the facts recited, the evidence shows that father has a television repair business in Elkhart which he has operated for approximately 14 years and which provides adequate income with which to support the children. He has two additional children, not previously mentioned, by still another marriage, one

of whom is in the custody of its mother and the other of whom lives with its grandparents. Ross Fuller is shown to be an itinerant, emotional incompetent. He does not consistently hold a job and for a short time he was in a mental hospital. Apparently he had a drinking problem at one time which he has since overcome. In addition to his two children born out of wedlock by father's present wife, formerly Beverly Walston, Fuller had a third child by a woman not heretofore mentioned. He supports none of these children. He and mother have also had a child born to them since their marriage. Since the group living with Fuller have been in Oregon, they have applied for public assistance and have lived in several different places. There is no evidence that Fuller has mistreated the children, and the trial judge remarked that Fuller appeared to have a personality warmer than father's. One of Tracy's school teachers testified that Tracy was an outgoing and happy child who came to school clean and well groomed, and that although she had some trouble due to a short attention span, she was making good progress, was amenable to instruction and showed no serious signs of emotional impairment. At the time of trial James, Jr., had not as yet had contact with the school system.

The trial judge reached several conclusions, including the following:

1. The Indiana decree was punitive and was made by an incompletely informed court;

2. Mother committed an act of misconduct by taking the children from Indiana and secreting them in Oregon;

3. Oregon had become the home state of the children and the more convenient and appropriate forum for considering their best interests;

4. There had been a substantial change in circumstances following the Indiana decree;

5. There were no affirmative reasons to award

custody to either parent, and, under those circumstances, the court would leave the children where it found them.

Accordingly, the court denied the writ of habeas corpus and modified the Indiana decree by awarding custody to the mother. The Court of Appeals reversed, stating that

"* * * the mother's failure to return the children to the father as required by the Indiana decree amounts to a violation of that state's custody decree and, further, that this violation, when coupled with the mother's secreting the children in Oregon, makes this a proper case for the courts of Oregon to decline to exercise their jurisdiction. * * *." 25 Or App at 584.

■ The first question which arises is whether the Oregon court has jurisdiction. We turn to ORS 109.730(1)(a) and (b) (Section 3(a)(1) and (2) of the Uniform Act), which is as follows:

"*Jurisdiction over child custody determination.* (1) *A court of this state* which is competent to decide child custody matters *has jurisdiction to make a child custody* determination by initial or *modification* decree *if:*

"(a) *This state is the home state of the child* at the time of commencement of the proceeding, * * *; [or]

"(b) *It is in the best interest of the child that a court of this state assume jurisdiction because* the child and his parents, or *the child and at least one contestant, have a significant connection with this state, and there is available in this state substantial evidence concerning the child's present or future care, protection, training, and personal relationships;* [or]

"* * * * *." (Emphasis ours.)

ORS 109.710(5) (Section 2(5) of the Uniform Act) defines "home state" as follows:

" 'Home state' means the state in which the child, immediately preceding the time involved, lived with his parents, a parent, or a person acting as parent, for at least six consecutive months, * * *."

From the above it is apparent that the Oregon court has jurisdiction. Oregon is the children's "home state"

under ORS 109.730(1)(a) since they lived with a parent in Oregon for more than six consecutive months immediately prior to the commencement of these proceedings. The court also has jurisdiction under subsection (1)(b) of the same section because the children and their mother have a significant connection with Oregon, and there is available in Oregon substantial evidence concerning the children's present and future care, protection, training and personal relationships.

The more troublesome issue is whether the court *should exercise* its jurisdiction. Father contends that it should not because mother wrongfully took the children from Indiana, without the consent of the Indiana court, for the purpose of escaping that court's jurisdiction. In order to exercise jurisdiction in such a situation, two hurdles must be overcome. The first one is ORS 109.840(1) (Section 14(a)(1) and (2) of the Uniform Act) which is as follows:

> "Modification of decree of another state. (1) *If a court of another state has made a custody decree, a court of this state shall not modify that decree unless it appears to the court of this state that the court which rendered the decree does not now have jurisdiction under jurisdictional prerequisites substantially in accordance with ORS 109.700 to 109.930* or has declined to assume jurisdiction to modify the decree and the court of this state has jurisdiction.
>
> "* * * * *." (Emphasis ours.)

Because of the above provision, we must again look to the jurisdictional subsections, ORS 109.730(1)(a) and (b), to determine whether, under the circumstances here, Indiana also presently would have jurisdiction under the Act. If it would, Oregon courts may not exercise their jurisdiction. It is clear that Indiana would not have jurisdiction under subsection (1)(a) (regardless of whether or not it has jurisdiction under the laws of the State of Indiana) because Indiana cannot now qualify as the children's "home state,"

since the children have not lived in Indiana for 18 months.

Subsection (1)(b) offers more difficulty. One parent certainly has a significant connection with Indiana, and there is available there substantial evidence concerning the children's relationship with that parent and, thus, their future care, protection, training, and personal relationships if they are to be returned to Indiana. However, at the time of the hearing by the trial court the children had no significant connection with Indiana because of the length of time they had been away. In the lives of children 4 and 8 years of age, 18 months is a long time. Furthermore, the children had had no contact with their father for 20 months. The Commissioners' Note, 9 Uniform Laws Annotated 107, 108, § 3 (Master ed 1973) contains the following comment:

> "Paragraph (2) [Subsection (1)(b) of ORS 109.730] perhaps more than any other provision of the Act requires that it be interpreted in the spirit of the legislative purposes expressed in section 1. The paragraph was phrased in general terms in order to be flexible enough to cover many fact situations too diverse to lend themselves to exact description. But its purpose is to limit jurisdiction rather than to proliferate it. The first clause of the paragraph is important: jurisdiction exists only if it is in the *child's* interest, not merely the interest or convenience of the feuding parties, to determine custody in a particular state. The interest of the child is served when the forum has optimum access to relevant evidence about the child and family. There must be maximum rather than minimum contact with the state. The submission of the parties to a forum, perhaps for purposes of divorce, is not sufficient without additional factors establishing closer ties with the state. Divorce jurisdiction does not necessarily include custody jurisdiction. See Clark, Domestic Relations 578 (1968)." (Emphasis in original.)

It is clear that the Commissioners intended to prevent the proliferation of jurisdiction. It is also clear, however, that they did not intend that the existence of "home state" jurisdiction in one state (in

the present case, Oregon) should automatically preclude the existence of jurisdiction in another state (in the present case, Indiana). Jurisdiction in another state will exist when it is in the best interests of the children because they and a parent have a significant connection with that state and because there is available in that state substantial evidence concerning the children's present or future circumstances. The above comment indicates that the requirement of the availability of "substantial evidence" should be understood to require optimum access to relevant evidence. It appears that at the time of the commencement of the proceedings in Oregon, Indiana, the state from which the children had been absent for 18 months, no longer had optimum access to relevant evidence. As to the requirement of a "significant connection," the existence of the custody decree issued after a hearing by the court in Indiana may be a factor favoring continued jurisdiction in Indiana. Commissioners' Note, 9 Uniform Laws Annotated 122 (Master ed 1973). That factor is weakened, however, by the failure of the decree ever to take effect and by the passage of time since its issuance. Under the facts here, we conclude that under the Act there is neither "significant connection" nor "substantial evidence" in Indiana. Under the Act both must exist. It would therefore not be in the best interests of the children for Indiana to assume jurisdiction, and Indiana therefore does not now have jurisdiction under the Act.

Having decided that the Oregon court qualifies to exercise jurisdiction under the provisions of ORS 109.840(1), we must next turn to ORS 109.780(2) (Section 8(b) of the Uniform Act) to see if the court also is qualified to exercise its jurisdiction thereunder. The Commissioners' Note at page 116, Section 8, makes it clear that when the petitioner for modification has wrongfully removed the children from another state which had jurisdiction, the provisions of both the jurisdictional statute and this statute must be met before the courts of the state to which the children

[ 767 ]

have been removed may exercise its jurisdiction. ORS 109.780(2) states:

"* * * * *.

"*Unless required in the interest of the child, the court shall not exercise its jurisdiction to modify a custody decree of another state if the petitioner,* without consent of the person entitled to custody, *has improperly removed the child* from the physical custody of the person entitled to custody or has improperly retained the child after a visit or other temporary relinquishment of physical custody. If the petitioner has violated any other provision of a custody decree of another state the court may decline to exercise its jurisdiction if this is just and proper under the circumstances. (Emphasis ours.)

"* * * * *."

The above subsection incorporates the "clean hands doctrine" as it applies to this case. Mother contends that this subsection has no application because she had legal custody of the children at the time she came to Oregon and did not remove the children from the physical custody of another person who was entitled to custody or violate any other provision of a custody decree. The contention is not valid because her acts in removing the children are within the intent, if not the literal provision, of the statute. She had only *temporary* custody of the children, subject to further court order upon the trial of the divorce proceeding. She was a temporary caretaker for the court and did not have custody that entitled her to remove the children from the court's jurisdiction. Her act was just as culpable as if she had removed the children from the legal and physical custody of father or retained them after a visit and then taken them from Indiana. It is the *kind of act* which the Act intended should preclude the exercise of jurisdiction—unless the best interests of the children otherwise require.

In further attempting to avoid the strictures of the same subsection, mother also claims that the Indiana decree was "punitive" in that it was an attempt by that court to punish her for taking the children from its

jurisdiction. She argues, therefore, that the court was not acting in the best interests of the children, and that its decree is not the kind of decree which should prevent Oregon from exercising jurisdiction. The trial court found that the Indiana decree was punitive and that it was made by an incompletely informed court. There is no doubt that it was made by an incompletely informed court; however, there is no indication that the decree was made to punish mother. The record of the Indiana proceeding discloses that the evidence which was presented to that court gave it no choice but to give custody to father. The incompleteness of the information was caused by mother's having left the jurisdiction with the children and having failed to appear. For an example of a punitive decree, see *Brooks v. Brooks,* 20 Or App 43, 530 P2d 547 (1975).

This case thus presents the hard choice of whether, under the Act, a court should exercise modification jurisdiction when it is presented with the following circumstances:

1. Mother, contrary to authority, removes the children of young age from their state of residence and secretes them for the purpose of avoiding a custody proceeding;

2. A court of the state of original residence grants custody to father after mother absconds, because the information available to that court dictates that such a disposition is proper;

3. Father is unable to find the children until after mother and children have established a residence of long duration in another state;

4. Legal proceedings are commenced in the state of the children's new residence for modification of the custody decree, and the court has all parties before it and optimum access to relevant evidence about the children and their family, and the children now have maximum contact with their new state of residence;

5. The court granting the original decree had

incomplete information concerning the best interests of the children because of mother's wrongful act in leaving that state with the children; and

6. It is probable that the court of the state of original residence will never have an opportunity to litigate custody with the full facts before it because mother will be unable to afford it.

■ Two of the principal purposes of the Act are to discourage forum shopping and to protect the best interests of children. It cannot be denied that by allowing the Oregon court to exercise its jurisdiction we would put a premium upon an improper removal of children from their state of original residence. Mother will have been permitted to enjoy the jurisdiction of a court which may treat her more favorably than would the court of the state of original residence. The success and duration of the secretion of the children will have made the children's removal from mother more difficult because she has become the only parent the children really know. On the other hand, the best interests of the children require that at some time a determination be made upon all relevant facts without respect to prior parental disregard of court proceedings, and the present proceeding is probably the only opportunity which will ever exist to make such a determination.

Although the decisions referred to *infra* were not decided under the Uniform Act, they nevertheless demonstrate the attitude some courts were taking even then when faced with a similar dilemma. The following language was the answer in the case of *In re Guardianship of Rogers,* 100 Ariz 269, 413 P2d 744, 749 (1966):

"* * * We believe when such conduct as defying a sister state custody decree occurs the trial judge must delicately weigh that factor with all other evidence before him in properly exercising his discretion. Any other holding would punish innocent children for the wrongs committed by their parents and would prevent

the inquiry to be made by the trial judge in determining where the best interests and welfare of the child lie."

Also see *Smith v. Smith,* 135 Cal App 2d 100, 286 P2d 1009, 1013 (1955).

■■ A close reading of the Act discloses a schizophrenic attempt to bring about an orderly system of decision and at the same time to protect the best interests of the children who may be immediately before the court. When put to the test of a factual situation presenting an irreconcilable conflict between those two interests, we read the Act as making predominant the best interests of the children before the court. It is our conclusion that the best interests of the children require a hearing at some time on the full facts, that in this case the present proceeding is the only opportunity which is likely ever to exist, and that the trial court therefore properly exercised jurisdiction.

The Court of Appeals based its decision primarily upon the Commissioners' Note, 9 Uniform Laws Annotated 122-23 (Master ed 1973), which follows Section 14 of the Uniform Act (ORS 109.840). The note, in part, is as follows:

> "* * * [I]f the father * * * continued to live in state 1 [state of original residence], but let his wife keep the children [in another state] for several years without asserting his custody rights and without visits of the children in state 1, modification jurisdiction of state 1 would cease. Compare Brengle v. Hurst, 408 SW2d 418 (Ky. 1966). The situation would be different if the children had been abducted and their whereabouts could not be discovered by the legal custodian for several years. The abductor would be denied access to the court of another state under section 8(b) * * *."

As the Court of Appeals states, 25 Or App at 583-84, this would seem to fit the situation in the present case. However, when we look at Section 8(b) of the Uniform Act (ORS 109.780(2)), to which the above language of the Commissioners' Note obviously refers, we see that it commences with the language, "*Unless required in the interest of the child,* the court shall not

exercise its jurisdiction * * *." (Emphasis ours.) In the Commissioners' Note under Section 8(b) of the Uniform Act, 9 Uniform Laws Annotated 115, 116 (Master ed 1973), we find the following language:

> "* * * In the case of illegal removal or retention refusal of jurisdiction is mandatory unless the harm done to the child by a denial of jurisdiction outweighs the parental misconduct. * * *."

The seeming inconsistency between the two Commissioners' Notes is confusing at best. We conclude that the language of Section 8(b) and the comment thereunder should control the scope of that section rather than the comment under a different section which appears not to be properly qualified.

██ This leaves the sole question of whether the trial court, after correctly exercising jurisdiction, properly found a change of circumstance justifying a grant of custody to mother. Had this been the only issue in the case we would not have taken review. The trial judge found there had been a substantial change of circumstance, and with this finding we agree. In the determination of a case of this kind so much depends upon observation by the trial judge of the people involved that, although we try the matter anew on the record, we are not inclined to overrule the trial judge unless it clearly appears that he is wrong. This is not a case where the action by the trial judge appears to have been wrong. Albeit that neither of the parents is one that we would choose to rear children, an unenviable choice must be made. For practical purposes, mother's association with the children has been much closer than father's. We believe it would be a colossal mistake and detrimental to the children to take them away from mother, who has reared them from infancy, and to give them to a father they hardly know, when there is no evidence that the children have suffered from mother's custody. The Court of Appeals overruled the trial court because it believed not that father would make a better parent but because the Uniform Act required such a result. We believe the Court of

Appeals was in error, and we reverse its determination and remand the case to the Court of Appeals with directions to reinstate the decree of the trial court.