Argued and submitted February 4, reversed and remanded June 30, 1981

In the Matter of the Custody of
Jennifer Lynn Ross, a minor child.

**GRUBS,**
*Petitioner,*

*v.*

**ROSS,**
*Respondent.*

(No. 7 UCCJ, CA 15346, SC 27261)

630 P2d 353

Leeroy O. Ehlers, Pendleton, argued the cause and filed a brief for petitioner.

Gary R. Luisi, Hermiston, argued the cause and filed a brief for respondent.

PETERSON, J.

## PETERSON, J.

This case involves the abduction and subsequent concealment of a child by her father in anticipation of pending divorce proceedings in Montana, in order to obtain *de facto* custody and exclude the mother from any custody. When the present custody action was commenced in May, 1979, the child was a little over three years of age; at the time of her abduction by her father, she was 19 months old. The case squarely presents the problem of determining the jurisdictional limitations that ORS 109.840 — section 14 of the Uniform Child Custody Jurisdiction Act (The UCCJA, or, herein, the "Act") — imposes on a forum state in applying the provisions of the Act where modification of a custody decree from another state is involved.

In this opinion we will refer to the parties as "father" and "mother," to the state where the original custody decree was made — in this case, Montana — as the "decree state," and to the state where modification is sought — in this case, Oregon — as the "forum state."

We draw upon the opinion of the Court of Appeals for the facts:

"The child was born in Billings, Montana, January 19, 1976. Her parents were married [four] months later. The parties separated August 26, 1977. Two days later, while father had the child temporarily in his custody, he left Billings with the child and an 18-year old woman he had known about a month. He married this woman shortly before the Oregon custody hearing.

"Mother filed for divorce in Montana on August 30, 1977. Service was made by publication, father's whereabouts being unknown. [Father continued to reside in Montana for nearly two months following the abduction.] Mother was granted a divorce by default and awarded custody of the child on October 26, 1977. Unable to locate the child, mother, in December, 1977, initiated criminal charges against father for custodial interference.

"Meanwhile father, his girlfriend and the child had settled in Milton-Freewater, Oregon, in October, 1977. Father had contacted mother to assure her of the child's safety and to tell her he intended to keep the child with him. He was aware the mother was taking steps to gain physical custody of the child, but he made no move to seek lawful custody himself.

"Father continued to make occasional phone calls to mother to assure her of the child's welfare, but he never disclosed the child's location. Mother had no knowledge of the child's whereabouts until May 15, 1979, when father was arrested in Milton-Freewater for custodial interference.

"Mother then filed this suit in Umatilla County Circuit Court, petitioning for enforcement of the Montana decree. Father's answer prayed the Oregon court to assume jurisdiction and hold a full hearing to determine custody of the child and asked that custody be awarded to him.

"Following a hearing on May 18, 1979, the court concluded that Oregon has jurisdiction and that an Oregon court should exercise its jurisdiction and hold a custody hearing. The court denied mother's petition for enforcement of the Montana decree. The custody hearing was held on July 11 and 12, 1979, and on July 23, the court awarded custody of the child to father." 47 Or App at 633-634.

The Court of Appeals affirmed. Its opinion indicates that the court believed that a previous decision of this court, *Settle and Settle,* 276 Or 759, 556 P2d 962 (1976), required affirmance. Presiding Judge Joseph concurred specially, suggesting that *Settle* should be re-examined. 47 Or App at 639.

Because of the public importance of the problems presented by this case and the national recognition being accorded the problem of parental seizure, restraint, concealment and interstate transportation of children with concomitant disregard of court orders and excessive relitigation, because of the harm to children that "seize-and-run" tactics may engender, and because of our concern whether *Settle* was correctly decided, we granted the mother's petition for review.

## EVENTS LEADING TO ADOPTION OF
## UNIFORM CHILD CUSTODY JURISDICTION ACT

Considerable confusion, and even greater dissatisfaction, have resulted from the proliferation of conflicting opinions from various state courts in determining child custody questions where the parties resided in different states, and where courts of several states either entered conflicting decrees or concurrently exercised jurisdiction on the same issue. Decisions of the Supreme Court of the

United States have done little to resolve the ongoing problems.[1]

Until the adoption of the Act, the trend was "* * * to sue in the courts of almost any state, no matter how fleeting the contact of the child and family was with the particular state, with little regard to any conflict of law rules."[2] There was little certainty as to which state had jurisdiction when persons seeking custody of a child simultaneously or successively sought relief in courts of different states, there was no certainty that a decree rendered in one state would be enforced in another, and there was no rule as to when one state could or should modify the custody decree of another state.[3] This resulted in situations in which a party might face contempt punishment and perhaps criminal charges for child stealing in one state when complying with the decree of another. Some states, deeming that the state had an interest in the domestic tranquility of its citizens and residents, overturned custody decrees made in another state.[4] Oregon was not exempt

---

[1] *Compare May v. Anderson,* 345 US 528, 73 S Ct 840, 97 L Ed 1221 (1953), and *Kulko v. Superior Court,* 436 US 84, 98 S Ct 1690, 56 L Ed 2d 132 (1978).

The answer to the full faith and credit question under Article IV, section 1, of the United States Constitution, has again been deferred. In *Webb v. Webb,* 101 S Ct 1889, 68 L Ed 2d 392 (1981), the Supreme Court granted and then dismissed a writ of certiorari in a case involving the concurrent exercise of custody jurisdiction by courts in Georgia and Florida. The writ was dismissed because the federal issue had not been raised in the trial court. The Georgia Supreme Court opinion is found at 245 Ga 650, 266 SE2d 463 (1980). The case involved concurrent exercise of custody jurisdiction by the courts of two states, each of which had adopted the UCCJA. The case was decided in the trial court prior to the passage of the Parental Kidnapping Prevention Act of 1980. *See* note 20, below.

[2] Commissioners' Prefatory Note, 9 Uniform Laws Annotated 112 (Master ed 1979).

[3] *Id.*

[4] "Under this state of the law the courts of the various states have acted in isolation and at times in competition with each other; often with disastrous consequences. A court of one state may have awarded custody to the mother while another state decreed simultaneously that the child must go to the father. * * * In situations like this the litigants do not know which court to obey. They may face punishment for contempt of court and perhaps criminal charges for child stealing in one state when complying with the decree of the other. Also, a custody decree made in one state one year is often overturned in another jurisdiction the next year or some years later and the child is handed over to another family, to be repeated as long as the feud continues * * *." Commissioners' Prefatory Note, 9 Uniform Laws Annotated 113 (Master ed 1979).

from such problems. *See Hawkins v. Hawkins,* 264 Or 221, 504 P2d 709 (1972);[5] *Dieringer v. Heiney,* 10 Or App 345, 497 P2d 1201 (1972); *Duke v. Hanna,* 5 Or App 223, 483 P2d 471 (1971); *Bacon v. Bacon,* 3 Or App 85, 472 P2d 283 (1970); *Godfrey v. Godfrey,* 228 Or 228, 364 P2d 620 (1961); *Fox v. Lasley,* 212 Or 80, 318 P2d 933 (1957); *Allen v. Allen,* 200 Or 678, 268 P2d 358 (1954); *Lorenz v. Royer,* 194 Or 355, 241 P2d 142, 242 P2d 200 (1952).

Dissatisfaction with such problems led the Commissioners on Uniform State Laws to draft the UCCJA, which has now been adopted, without substantial amendment in most cases, in some 38 states.[6] The Uniform Commissioners, when drafting the Uniform Child Custody Jurisdiction Act, recognized the singular importance and present and pressing need to eliminate laws which encouraged or fostered the unilateral abduction and concealment of children by one of their warring parents seeking to avoid an unfavorable custody decree, existing or prospective, while searching for a more favorable forum. The Commissioners described the Act as follows:

"The Act is designed to bring some semblance of order into the existing chaos. It limits custody jurisdiction to the state where the child has his home or where there are other strong contacts with the child and his family. See Section 3. It provides for the recognition and enforcement of out-of-state custody decrees in many instances. See Sections 13 and 15. Jurisdiction to modify decrees of other states is limited by giving a jurisdictional preference to the prior court under certain conditions. See Section 14. Access to a court may be denied to petitioners who have engaged in child snatching or similar practices. See Section 8. Also, the Act opens up direct lines of communication between courts of different states to prevent jurisdictional conflict and bring about interstate judicial assistance in custody cases."[7]

The Act aims to avoid the jurisdictional conflicts and confusions which have resulted in the past by

---

[5] *Hawkins v. Hawkins,* 264 Or 221, 504 P2d 709 (1972), contains an extensive discussion of the Oregon precedents and citations to the literature then existent.

[6] 9 Uniform Laws Annotated (Master ed), 1981 Cumulative Annual Pocket Part 8.

[7] Commissioners' Prefatory Note, 9 Uniform Laws Annotated 114 (Master ed 1979).

providing, as clearly as possible, for *one* court in *one* state to have major responsibility to determine who is to have custody of a particular child. Unfortunately, the Act has failed to achieve its goal in some cases.

## DISCUSSION OF PERTINENT SECTIONS OF THE UCCJA

ORS 109.720(2) provides that the Act "* * * shall be construed to promote the general purposes stated in this section." ORS 109.720(1)[8] lists nine general purposes, the first two of which are:

"(1) The general purposes of ORS 109.700 to 109.930 are to:

"(a) Avoid jurisdictional competition and conflict with courts of other states in matters of child custody which have in the past resulted in the shifting of children from state to state with harmful effects on their well-being;

"(b) Promote cooperation with the courts of other states to the end that a custody decree is rendered in that state which can best decide the case in the interest of the child;"

There are two additional general purposes which have specific relevance to this case. ORS 109.720(1)(c) and (e) provide that the Act aims to:

"(c) Assure that litigation concerning the custody of a child takes place ordinarily in the state with which the child and his family have the closest connection and where significant evidence concerning his care, protection, training, and personal relationships is most readily available, and that courts of this state decline the exercise of jurisdiction when the child and his family have a closer connection with another state;

"* * * * *

"(e) Deter abductions and other unilateral removals of children undertaken to obtain custody awards;"

Relevant jurisdictional provisions of the Act include ORS 109.730 and ORS 109.840. ORS 109.730 provides, in part, as follows:

---

[8] The Oregon version of the UCCJA is found at ORS 109.700-109.930. ORS 109.730 is section 3 of the Uniform Act. ORS 109.840 is section 14 of the Uniform Act. By subtracting 70 from the fourth and fifth numbers of the citation, one will generally know the corresponding number of the Uniform Act. For example, ORS 109.820 is section 12 of the Uniform Act (82 less 70 equals 12). The exceptions: Section 1 of the Act is ORS 109.720; Section 2 of the Act is ORS 109.710.

"(1) A court of this state which is competent to decide child custody matters has jurisdiction to make a child custody determination by initial or modification decree if:

"(a) This state is the home state of the child at the time of commencement of the proceeding, or had been the child's home state within six months before commencement of the proceeding and the child is absent from this state because of his removal or retention by a person claiming his custody or for other reasons, and a parent or person acting as parent continues to live in this state; [or]

"(b) It is in the best interest of the child that a court of this state assume jurisdiction because the child and his parents, or the child and at least one contestant, have a significant connection with this state, and there is available in this state substantial evidence concerning the child's present or future care, protection, training, and personal relationships;

"* * * * *."

■ It is probably fair to say that the purpose which pervades the Act is to provide that child custody determinations will be made in the state where there is optimum access to evidence. *See* Commissioners' Comments to Section 3 of the Act, 9 Uniform Laws Annotated 123-125 (Master ed 1979). ORS 109.720(1)(c) states that one of the general purposes is to "assure that litigation concerning the custody of a child takes place ordinarily in the state with which the child and his family have the closest connection and where significant evidence concerning his care, protection, training, and personal relationships is most readily available * * *." Consistent with this premise, forum state jurisdiction exists when the forum state is the "home state" of the child at the time of commencement of the proceedings. "Home state" is defined in ORS 109.710(5) as "* * * the state in which the child, immediately preceding the time involved, lived with his parents, a parent, or a person acting as parent, for at least six consecutive months * * *."[9] Therefore, even in cases involving abductions of

---

[9] Professor Ratner suggests that the "home state" jurisdiction provision rests upon these premises:

"Jurisdiction should *shift* to a state where the child has been living with a possessing parent or acting parent for at least six consecutive months, when home-state proceedings have not been filed within that time. During such a

over six months in length, where the parent has been in the forum state for six months or longer, jurisdiction would exist under ORS 109.730(1)(a) unless barred by another section of the Act.[10] As a corollary, in such cases jurisdiction would seem to exist, as well, under ORS 109.730(1)(b), for with the passage of time, the abducting parent and the child develop "a significant connection" with the state, and "substantial evidence concerning the child's present or future care, protection, training, and personal relationships" thereby becomes available in the state. Therefore, successful long-term concealment following an abduction may result in the vesting of jurisdiction in the forum state under section 3 of the Act, ORS 109.730(1). That was the holding of the trial court and the Court of Appeals in this case (47 Or App at 635), and that was the holding of this court in *Settle, supra,* 276 Or at 759, 764, 767.[11] Here, as in *Settle,* Oregon satisfies the jurisdictional prerequisites of either or both ORS 109.730(1)(a) and (b), and is empowered to act unless the exercise of that modification jurisdiction is prohibited by ORS 109.840(1) or some other section of the Act.

Section 14 of the Act, ORS 109.840, limits the power of a forum state court to modify a custody decree of another state. ORS 109.840(1) provides:

"If a court of another state has made a custody decree, a court of this state shall not modify that decree unless it appears to the court of this state that the court which

---

period the child acquires a new established home through personal attachments, school attendance, and adjustment to the physical and cultural environment. Consequently, most of the relevant evidence is probably now located there. Failure by the stay-at-home parent to petition within that time suggests acquiescence in the child's new home, and subsequent unilateral removal is inhibited." L. Ratner, Procedural Due Process and Jurisdiction to Adjudicate: (a) Effective-litigation Values vs. The Territorial Imperative (b) The Uniform Child Custody Jurisdiction Act, 75 Nw U L Rev 363, 386 (1980). (Emphasis in original; footnote omitted.)

[10] This was our conclusion in *Settle and Settle,* 276 Or 759, 764, 767, 556 P2d 962 (1976), which is discussed below, at pages 280-281.

[11] "* * * Oregon is the children's 'home state' under ORS 109.730(1)(a) since they lived with a parent in Oregon for more than six consecutive months immediately prior to the commencement of these proceedings. The court also has jurisdiction under subsection (1)(b) of the same section because the children and their mother have a significant connection with Oregon, and there is available in Oregon substantial evidence concerning the children's present and future care, protection, training and personal relationships." *Settle, supra,* 276 Or at 764-765.

rendered the decree does not now have jurisdiction *under jurisdictional prerequisites substantially in accordance with ORS 109.700 to 109.930* or has declined to assume jurisdiction to modify the decree and the court of this state has jurisdiction." (Emphasis added.)

Section 14 is designed to attain the general purpose set forth in ORS 109.720(1)(a) (to avoid jurisdictional competition and conflict) and to deter abduction of children, ORS 109.720(1)(e). The Commissioners' Note to section 14 contains these comments:

"* * * In order to achieve greater stability of custody arrangements and avoid forum shopping, subsection (a) [of section 14] declares that other states will defer to the continuing jurisdiction of the court of another state as long as that state has jurisdiction under the standards of this Act. In other words, all petitions for modification are to be addressed to the prior state if that state has sufficient contact with the case to satisfy section 3 [ORS 109.730]. The fact that the court had previously considered the case may be one factor favoring its continued jurisdiction. If, however, all the persons involved have moved away or the contact with the state has otherwise become slight, modification jurisdiction would shift elsewhere. * * *." Uniform Laws Annotated at 154 (Master ed 1979).

The Court of Appeals considered ORS 109.840(1) and concluded:

"Montana is no longer the home state of the child, nor are there now significant connections with Montana to enable a court of that state to assume jurisdiction. Though mother has a connection with Montana and there is available in that state evidence of the future care and protection with which the mother could provide the child, the child has not been in Montana since September, 1977. The only 'significant connection' the child now has with the state is the October, 1977, custody decree. That connection is weakened by the failure of the decree to take effect and by the passage of time. *See Settle and Settle,* 276 Or 759, 767, 556 P2d 962 (1976). Montana, therefore, had no jurisdiction at the time of the May, 1979, hearing." 47 Or App at 635-636.[12]

---

[12] The Court of Appeals was following our holding in *Settle and Settle,* 276 Or 759, 767, 556 P2d 962 (1976), wherein we stated:

The interrelation of section 14 (ORS 109.840(1)) and section 3 (ORS 109.730) is clear. The forum state may exercise its section 3 jurisdiction to modify a foreign custody decree unless prohibited under section 14 (ORS 109.840(1)). The forum state is forbidden to modify a foreign decree if the decree state would *now* have jurisdiction to modify its initial decree "under jurisdictional prerequisites substantially in accordance with [the Act] * * *."

The trial court apparently concluded that jurisdiction existed solely by virtue of ORS 109.730 because Oregon had a "more substantial connection" than Montana.[13] The Court

"* * * As to the requirement of a 'significant connection,' the existence of the custody decree issued after a hearing by the court in Indiana may be a factor favoring continued jurisdiction in Indiana. Commissioners' Note, 9 Uniform Laws Annotated 122 (Master ed 1973). That factor is weakened, however, by the failure of the decree ever to take effect and by the passage of time since its issuance. Under the facts here, we conclude that under the Act there is neither 'significant connection' nor 'substantial evidence' in Indiana. Under the Act both must exist. It would therefore not be in the best interests of the children for Indiana to assume jurisdiction, and Indiana therefore does not now have jurisdiction under the Act."

[13] The trial court's oral ruling was as follows:

"I don't feel that a person should be rewarded for, in effect, kidnapping a child, whether it's his own or not, and then successfully removing himself from attempts to find him for a sufficient period of time that it works to his benefit, but that doesn't appear to be the Uniform Child Custody Jurisdiction Act.

"First, the Court finds that within the meaning of the statute, this is the home state of the child. Jennifer has lived here in excess of six months immediately preceding the filing of the petition. She has lived here for at least one half of her life or approximately 18, 19 months of her some three years — a little bit over.

"Next, the Court does find that Jennifer and her father, one of the contestants here, each has a significant connection with this State, and that there is substantial evidence here as to the child's best interests. Therefore, the Court has jurisdiction should it choose to exercise it. I am persuaded from the evidence before me this morning — and here is the thing about this Act that pervades it: It is this idea of what is in the best interests of the child. That's one of the things about the Act that I don't like, and I appreciate the comment, 'This is a schizophrenic act,' because even though it said we can't reward that kind of behavior, it turns right around and says, 'If you can disappear long enough and establish more substantial connections in another state,' then, in effect, that's what we're going to do. We are going to have a hearing here and remove it from Montana, if that is the pervading atmosphere of the Act, and it apparently is. Both *WILLIAMS v. SACKER* and, recently, *SMITH v. SMITH* restated that.

"I find that there is a more substantial connection with Oregon than there is with Montana. This Court will exercise its jurisdiction. * * *"

The Court of Appeals, however, considered ORS 109.840(1) and decided this case consistent with the ruling in *Settle, supra.* We turn then to a discussion of the modification jurisdiction of the Montana courts under ORS 109.840(1) in May of 1979, "under jurisdictional prerequisites substantially in accordance with [the Act] * * *."[14]

## CONTINUING JURISDICTION OF DECREE STATE WHERE CHILD IS IMPROPERLY REMOVED AND CONCEALED

■ Even though father removed the child prior to the time mother filed her suit, there is no dispute that the child was improperly retained, and there is no claim that the Montana court lacked jurisdiction to enter its initial decree.[15] Apart from section 3 of the Act (ORS 109.730(1)), in May of 1979 Montana would probably have had jurisdiction to modify its decree.[16] It had jurisdiction at the time the original decree was entered. All parties resided there at the time the complaint was filed. The mother continued to reside there, and Montana has an interest in maintaining the integrity of its decree. But in determining whether Montana has jurisdiction under the Act we do not look alone to historical standards of procedural due process. The issue now before us — whether Oregon has modification jurisdiction under ORS 109.730(1)(a) and/or (1)(b) — depends upon whether Montana, in May of 1979, continued to

---

[14] We note that Montana has also enacted the Act. See MCA 40-7-101 to 40-7-125. Whether Montana has adopted the Act is not important to the analysis. See 9 Uniform Laws Annotated (Master ed 1979), 1981 Cumulative Annual Pocket Part 8.

[15] "Initial decree" is defined in ORS 109.710(6). *Compare* ORS 109.780(2), which concerns the application of the clean hands doctrine in a forum state having jurisdiction, when the petitioner has "improperly removed" or "improperly retained" the child. We do not decide this case under the clean hands statute, ORS 109.780(2).

[16] Subject to the requirements of the Fourteenth Amendment, the rule has long been established in Montana that a court entering a valid custody order retains continuing jurisdiction to modify such award based upon changed circumstances affecting custody since the original award. *Roebuck v. Bailes,* 162 Mont 71, 508 P2d 1057, 1060 (1973); *Brandner v. Brandner,* 154 Mont 373, 464 P2d 508, 511 (1970); *Corkill v. Cloninger,* 153 Mont 142, 454 P2d 911, 915 (1969); Mahan, *Recent Developments in Family Law in Montana,* 39 Mont L Rev 1, 4 (1978).

*Accord: Hawkins v. Hawkins,* 264 Or 221, 233, 504 P2d 709 (1972).

have jurisdiction "* * * under jurisdictional prerequisites substantially in accordance with [the Act] * * *."

Montana has adopted the UCCJA. It became effective on July 1, 1977. Chapter 537, Laws of Montana (1977). Its counterpart of ORS 109.730(1)(b) is R. C. M. 40-4-211(1)(b), which is, for all practical purposes, identical with ORS 109.730(1)(b).

Although the term "in the best interest of the child" is used in ORS 107.730(1)(b) and R. C. M. 40-4-211(1)(b) as one jurisdictional premise for initial or modification jurisdiction to exist under the Act, the determinative factors under ORS 109.730(1)(b) and R. C. M. 40-4-211(1)(b) actually are these:

1.    The child and at least one contestant must have a significant connection with the state whose jurisdiction is at issue; *and*

2.    There must be available, in the state whose jurisdiction is at issue, "substantial evidence concerning the child's present or future care, protection, training, and personal relationships."

Therefore, in determining whether Montana continued to have jurisdiction "under jurisdictional prerequisites substantially in accordance with the [Act]," we look at those two factors, as they relate to Montana.

As to the second factor, the evidence shows that the child had lived in Billings since birth, the child's mother had lived there since 1967, both the mother and father were employed in Billings, and they lived together with the child and her older sister following the child's birth until the child's abduction. There is substantial evidence in Montana concerning the type of care, training and love given to this child by both parents while the child was in Montana, and the record shows that evidence is available from other persons in Montana relative to the parental attitudes toward the child. Furthermore, evidence is available in Montana of the father's and mother's character, and finally, the record shows that there was substantial evidence in Montana as to the child's medical history.

The more difficult problem is to determine if the first requirement is met, whether "* * * the child and at

least one contestant, have a significant connection with [Montana] * * *." There is no question as to the relationship between the "one contestant" — the mother — and Montana. She continues to live there, in the same home as when the child was with her, and continues to work in Montana. So far as the mother is concerned, clearly Montana is the state with which she has the most significant connection.

But did the child, in May of 1979, continue to have a significant connection with Montana? Although the child then lived in Oregon, and although the child's father was in Oregon, it cannot be said that Montana lacked any connection with the child. The mother still lived there, and the relationship between mother and child is itself a significant one. Beyond that, although the child was forcibly removed at an early age, the child had other significant connections with the state. Her older sister continued to reside in the family home with the mother, and other friends and neighbors, who had also been involved in the child's upbringing also continued to live nearby.

It is clear from the purposes set forth in the Uniform Act, ORS 109.720, and from the commentary to the Act, that the framers aimed to deter abduction of children, so as to prevent the proliferation of custody jurisdiction in the cases of abducted children. It could not have been intended that unilateral removal of the child results in the deprivation of decree state jurisdiction upon the expiration of six months (the time necessary for a new state to become the "home state" of the child). Yet, it is inescapable that, with the passage of each day, the relationship of the abducted child to the decree state becomes a little less substantial. Ultimately, perhaps, decree state jurisdiction would cease to exist under ORS 109.730(1)(b). However, we remain convinced that we should construe the Act in favor of decree state jurisdiction for a reasonable period of time following the abduction of the child. We therefore conclude that Montana, in May of 1979, continued to have jurisdiction "under jurisdictional prerequisites substantially in accordance with [the Act], * * *" and that Oregon therefore could not modify the Montana decree, ORS 109.840(1).

Our holding in this regard is consistent, not only with the purpose of the Act, but with this statement from

our pre-Act decision in *Hawkins v. Hawkins,* 264 Or 221, 238, 504 P2d 709 (1972):

> "It is commonly said that although a court may have jurisdiction in a child custody case involving a previous custody order by a court of another state, it should be reluctant to 'exercise jurisdiction' in such a case unless and until it is satisfied that to do so would be 'in the best interests of the child,' based upon consideration of various facts and circumstances. Such a statement, however, is subject to possible misunderstanding.
>
> "What the trial court actually undertakes to do first in such a case is to decide, as a preliminary matter, whether it should proceed to hear the merits of the case (i.e., whether or not to modify the previous order of custody) or whether it should decline to hear the merits of the case and thereby give recognition to the previous custody order, either as a matter of full faith and credit or as a matter of comity. Where, for the purpose of making that preliminary decision, the trial court considers the facts and circumstances of the case it is 'exercising jurisdiction' within the usual meaning of that term. And where, at that stage of the proceeding, the trial court considers 'the best interests of the child,' it does so, not for the purpose of deciding whether the child will be better off with the mother or the father, but for the limited purpose of deciding whether it is in a better position than the original court to decide the merits of the case and thus serve the best interests of the child.
>
> \* \* \* "17

It is never in the best interest of the child to be subjected to the turmoil and disruption that often attends custody abduction schemes perpetrated by warring parents. Rather, it is in the child's best interest that courts act as strongly as possible to discourage such child abusive actions. On the interrelationship of ORS 109.730 and ORS 109.840(1) (sections 3 and 14 of the Act), the Reporter for the Act stated:

> "The Uniform Act gives jurisdiction to the child's 'home state', defined as the state in which the child has resided

---

17 Under the Act, the application of the term "in the best interest of the child," at one and the same time, apparently determines (1) exercise of forum state jurisdiction [ORS 109.730(1)(b)], (2) non-exercise of jurisdiction under the "clean hands" section of the Act (ORS 109.780(2)), and (3) exercise of decree state jurisdiction (ORS 109.840(1)). A "doubtful consistency" may be the result of applying this expansive term in the several situations. *See* Ratner, *supra,* note 9 at 399-400.

for the preceding six months. When a child stays in a state for six months or more as a visitor or a victim of abduction, the question arises whether the new state has power to modify the custody decree. The answer is that the Act does not permit the second state to take jurisdiction because the paramount jurisdiction of the prior state continues. Section 3 of the Act, the basic provision on subject matter jurisdiction, must be read in conjunction with section 14, which does not permit modifications by another state as long as the prior state's exclusive jurisdiction continues. This is true whether or not another state has technically become the child's home state. Any other reading of the Act would subvert its purposes by permitting a kidnapper to go into hiding for 6 months and then seek modification, and by encouraging a visited parent to prolong the period of visitation with or without consent of the custodial parent in order to seek modification in the visited state. *The Act does not support an interpretation which would encourage the very evils the Commissioners on Uniform State Laws intended to eradicate.*" (Emphasis added; footnotes omitted.)[18]

"Child-snatching" has become a serious societal problem. The literature, lay literature as well as legal literature, is filled with reports of angry parents who, afraid of losing custody of their children and encouraged by state laws, take matters into their own hands, often with disastrous consequences to the children.[19] In many states child-snatching is not regarded as a crime, and the parent

---

[18] Bodenheimer, *Progress Under the Uniform Child Custody Jurisdiction Act and Remaining Problems: Punitive Decrees, Joint Custody, and Excessive Modifications,* 65 Cal L Rev 978, 988 (1977)..

[19] "UCCJA: Why Adopted in Illinois, Considered a Haven for Childsnatching," New York Times, May 16, 1979, Sec III, at 14:2; "On Reducing the Child Snatching Syndrome," K. Lewis, Child. Today 7:18-21, November 1978; "Victim and a Childnapper Describe the Agonizing Problem of the Stolen Kids of a Divorce," S. E. Jares, People 15:40-2, February 9, 1981; "Join the Army and See Your Son [Abduction of T. Publicover by father]," Macleans 93:36, November 10, 1980; "I'll Never Give Up$ [Custody kidnapping by mother]," Readers Digest 117:90-4, September, 1980; "Anguished Mother Demands that Washington Help Her Find Stolen Daughter," People 14:81-2, July 14, 1980; "Kidnapped by Mom or Dad," Time 116:41, July 14, 1980; "Child Snatching Epidemic Stirs a Storm," US News 87:57, September 3, 1979; "I kidnapped My Own Son," Good Housekeeping 189:26, October 1979; "When Parents Kidnap Their Own," McCall's 107:54-5, December 1979; "Beyond Custody: When Parents Steal Their Own Children," Ms. 6:52-3, May, 1978; "Parents as Kidnappers," McCalls 103:39, August 1976.

whose child is abducted by the other parent often gets little or no help from law enforcement authorities in locating the abducted child or children.[20]

We believe that this holding is within the clear meaning of the Act, helps to attain the goals listed above, and will further one of the main purposes of the Act, without doing violence to other purposes of the Act.

We should (and do) emphasize that our holding in this case is limited to its facts. Perhaps a case will one day arise when the abduction has been of such a long duration and the child of such an advanced age that the decree state would cease to have jurisdiction under section 14, ORS 109.840(1). An abduction and concealment of but 21 months does not divest the decree state of jurisdiction. Any other holding (to quote *Settle,* 276 Or at 770) "[puts] a

---

[20] On December 28, 1980, Public Law 96-611 went into effect. Sections 6 to 10 are entitled the "Parental Kidnapping Prevention Act of 1980." Section 7(a) provides:

"(a)  The Congress finds that —

"(1)  there is a large and growing number of cases annually involving disputes between persons claiming rights of custody and visitation of children under the laws, and in the courts, of different States, the District of Columbia, the Commonwealth of Puerto Rico, and the territories and possessions of the United States;

"(2)  the laws and practices by which the courts of those jurisdictions determine their jurisdiction to decide such disputes, and the effect to be given the decisions of such disputes by the courts of other jurisdictions, are often inconsistent and conflicting;

"(3)  those characteristics of the law and practice in such cases, along with the limits imposed by a Federal system on the authority of each such jurisdiction to conduct investigations and take other actions outside its own boundaries, contribute to a tendency of parties involved in such disputes to frequently resort to the seizure, restraint, concealment, and interstate transportation of children, the disregard of court orders, excessive relitigation of cases, obtaining of conflicting orders by the courts of various jurisdictions, and interstate travel and communication that is so expensive and time consuming as to disrupt their occupations and commercial activities; and

"(4)  among the results of those conditions and activities are the failure of the courts of such jurisdictions to give full faith and credit to the judicial proceedings of the other jurisdictions, the deprivation of rights of liberty and property without due process of law, burdens on commerce among such jurisdictions and with foreign nations, and harm to the welfare of children and their parents and other custodians."

Other sections of the new law provide for federal agency assistance in locating abducted children.

premium upon an improper removal of children from their state of original residence."[21]

The key to the *Settle* decision was a finding that the "significant connection," required by ORS 109.730(1)(b), no longer exists between Indiana, the decree state, and the children whose custody was in dispute, due to the children's extended absence from that state at the time of the present proceedings. This finding was made with due regard to the fact that the children's absence had been due solely to their abduction and extended concealment by the parent who was now petitioning the court for their legal custody. The decision was based primarily on language contained in the Commissioners' Note to the jurisdiction section of the Act that suggests a general preference for what has been called a "facile tallying of contacts" over a "litigation-value analysis."[22]

---

[21] "The 3(a)(2) [ORS 109.730(1)(b)] catch-all provision not only encourages unilateral removal and retention, contrary to the purposes of the Act; it stimulates a more general forum shopping, with resultant uncertainty, harassment, multiplicity, and instability, by delegating to a vague judicial discretion the allocation of jurisdiction in many different situations which, though scarcely 'too diverse for exact description,' are not otherwise covered by the Act." Ratner, *supra,* note 9 at 392. *See* cases cited therein at notes 130, 160, 163, 171, 192.

[22] Ratner, *supra,* note 9 at 392. Professor Ratner is of the opinion that the *Settle* holding may contravene procedural due process. He writes:

"Exercise of jurisdiction by the concealed home state of the child and an abducting claimant, pursuant to 3(a)(1) or 3(a)(2), perhaps contravenes procedural due process. Such jurisdiction is supported by optimal access to evidence, along with the convenience-familiarity of a resident petitioner, but encourages harassment and abduction, disregards the convenience-familiarity of defendant, proliferates litigation, undermines the preexisting due process jurisdiction of an unconcealed home or authorized home state, and vitiates the effectiveness of custody adjudication by impairing its child-stability goal. * * *." 75 Nw L Rev 363 at 418.

Regarding *Settle,* Professor Bodenheimer opined:

"* * * On the other hand, a recent Oregon case *[Settle]* considered the children's presence in that state for approximately 20 months as one reason for its assumption of jurisdiction in an action challenging an Indiana decree although the mother had wrongfully removed the children pending the divorce and the father had been unable to locate them. If the present wave of child stealings and concealments continues, and parents searching for lost children continue to receive insufficient aid from law enforcement officials, courts will presumably decline to follow the course of the Oregon court. They will instead return all children who are wrongfully taken or detained in violation of a custody decree, perhaps within an outer limit of 3 or 4 years, depending upon the circumstances." (Footnotes omitted.) Bodenheimer, *supra,* note 18, 65 Cal L Rev at 989.

■ Our holding herein is inconsistent with *Settle, supra,* and to the extent that this result differs from *Settle,* it is overruled. In the case of an abducted child whose whereabouts is concealed, where "substantial evidence" of a child's present or future welfare for purposes of the jurisdiction section (ORS 109.730(1)(b)) still exists in the decree state as well as in the forum state, for the reasons set forth above, the decree state continues to have jurisdiction under the Act for a reasonable time following the abduction.[23]

Reversed and remanded with instructions to (1) vacate the order denying mother's petition for enforcement of the Montana decree, (2) vacate the July 23, 1979, decree of custody determination, and (3) enter a decree recognizing and enforcing the Montana decree pursuant to ORS 109.830 (including the immediate transfer of physical custody of the child to mother).

Costs to mother.

---

[23] This holding is consistent with the results in recent decisions in similar cases by courts of several other jurisdictions. *See Both v. Superior Court, In & For County of Mohave,* 121 Ariz 381, 590 P2d 920 (1979); *Kraft v. Dist. Court,* 197 Colo 10, 593 P2d 321 (1979); *Matter of Potter,* 10 Ohio Op 3d 214, 377 NE2d 536 (1978). These cases essentially hold that in "seize-and-run" cases, where there exists a valid custody decree and the "wronged" parent continues to reside in the state of the decree from which the child was removed, jurisdiction under the Act will exist presently for purposes of Section 14(1) of the Act (ORS 109.840(1)) and a petition for modification may not be entertained in another state. *See also, Allison v. Superior Court of Los Angeles County,* 99 Cal App 3d 933, 160 Cal Rptr 309 (1979); *Clark v. Clark,* 416 NYS2d 330, 67 AD2d 388 (1979).

A different approach was used to obtain a similar result in *Freeman v. Freeman,* 547 SW2d 437, 441 (Ky 1977). There, in another "seize-and-run" case, the court held that where child abduction and concealment is involved, the child's concealment will be considered as having tolled the period of his residency for purposes of calculating "home state" status for Section 3(1)(a) jurisdiction (ORS 109.730(1)(a)).